1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

11

KEVIN MICHAEL BELL

12                    Plaintiff,

13          v.

14   CITY OF LACEY; Police Chief DUSTY
PIERPOINT individually; Police Commander
15   JOE UPTON individually; City Attorney
DAVID SCHNEIDER individually; Mayor
16   ANDY RYDER individually; City Manager
SCOTT SPENCE individually; DOEs 1-25
17   individually, NISQUALLY TRIBE, Nisqually
CEO JOHN SIMMONS, individually and
18   Nisqually CFO ELETTA TIAM individually.

19                    Defendants.

20

21

NO.  3:18-cv-05918-RBL

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER (with notice to
adverse party)

**Noted for consideration:** 2/19/2019 _____

22

23

24

25

26

TRO MOTION

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
www.MillikanLawFirm.com

Page **1** of 18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## I.   MOTION

PLAINTIFF hereby moves the Court for a Temporary Restraining Order prohibiting the City from placing Plaintiff in any tribal detention facility and prohibiting Nisqually Indian Tribe from detaining Plaintiff at any time pending a final ruling on the merits.  Plaintiff is in the process of resolving the 2016 misdemeanor charges that resulted in his prior pretrial detention, and severe stroke, in Nisqually Jail.   If granted, Plaintiff also requests a date for the Court to consider converting the TRO into a preliminary injunction as to himself pendente lite, and in due course Plaintiff will seek to permanently enjoin this practice as to all similarly situated.  Plaintiff's next pretrial hearing on his criminal matters is set for Monday, February 25, 2019.

## II.   FACTS

**Background Facts: The Agreement**

The Municipal Defendants (*"City"*) unlawfully contracted with Nisqually under the Nisqually Jail Service Agreement (*"Agreement"*) to remove non-natives from Lacey and place them into the tribal jail to await trial and serve sentences. Dkt. #9, pp. 21-27.  Under the Agreement, the City houses pretrial detainees and inmates at the Nisqually Detention and Corrections Center (*"Nisqually Jail"*) located at 11702 Yelm Hwy SE, Olympia, WA 98513.  Nisqually Jail is located within the jurisdiction of, and operated by, Nisqually Indian Tribe.  Millikan Decl. Ex. A.  Plaintiff is not a Native American.

Beyond the illegality of its very inception, the Agreement unconstitutionally equates pretrial detainees with convicted persons, designating both "prisoner" and affording them equal treatment. Dkt. # 9, pg. 23.  Under the Agreement, the City is solely responsible for the nonemergency medical care of detainees and Nisqually is responsible for emergency care.  The Agreement does not comply

TRO MOTION

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **2** of 18

1   with the state or federal Constitutions and is not authorized by RCW 70.48 (as it falsely asserts) or

2   any other federal or state, banishment, exile, transfer, or deportation authority.[1]

3        Under the Agreement, Nisqually may not provide emergency care without first making "the

4   best efforts to contact the City."  As the prisoner suffers, Nisqually must attempt to solicit from the

5   City an approval or denial of care, the latter operating to "relieve Nisqually of liability to the City

6   for any injury resulting" from said denial. Dkt. #9, pg. 24.  In other words, Nisqually is contractually

7   obligated to treat captives with medical and custodial negligence, and both parties are induced to

8
9   pass jeopardized prisoners back and forth in hot potato fashion.

10        Treatment of "prisoners" is not calibrated to state or federal statutory or constitutional law

11   but consigned to the caprice of Nisqually managerial personnel as it pertains to "overcrowding…,

12   or health, safety or security risks."  Under the Agreement, "Care" includes only "room and board."

13   Dkt. #9, pg. 23.  The "prisoners" are not treated as humans but as head of cattle.  The City pays

14
15   Nisqually over $1,000 per day for a guaranteed number of open beds, then around $65 per head of

16   booked prisoner each day.  Dkt. #9, pp. 23-24.  Given the historical mistreatment of Native

17   Americans by non-natives, the arrangement is also foreseeably conducive of a racial animus

18   observed and felt by Plaintiff.

19        Attorneys' access to clients is equated with police officers and investigators and is subject,

20   not to the Sixth Amendment, but to "necessary security rules" of Nisqually.  Dkt. #9, pg. 25.  Law

21   enforcement is guaranteed access to an interview room, but attorneys are not.  Though Nisqually

22   expressly waives sovereign immunity in its contracts with other municipalities, the Agreement

23   contains only an equivocal "Venue and Choice of Law" clause that may or may not functionally

24
25

26   _____

[1] The terms, 'exile, banishment, transfer, deportation, and extradition' are used interchangeably in this pleading.

TRO MOTION

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **3** of 18

equate to such waiver.  Thus if this Court eventually finds tribal sovereign immunity, Plaintiff and those similarly situated will have possessed only the double indemnification clause as a cheap substitute for the United States Constitution.  Dkt. #9, pg. 26.

**Background Facts:  Inside Nisqually Jail: Deaths and Grievous Bodily Injuries.**

In October of 2012, a 53-year-old Lacey man died of a heart attack in the Nisqually Jail. Millikan Decl. Ex. B, pp. 1-2.  In April of 2016, a Yelm teenager died of a neglected heart condition in Nisqually Jail.  Ex. B. pg. 3-8; Steve Miletich, <u>Fatal Confines? A teen's troubling death in Nisqually tribal jail</u>, Seattle Times, Jan. 9, 2017, available at https://www.seattletimes.com/seattle-news/crime/fatal-confines-a-teens-troubling-death-in-nisqually-tribal-jail/.  The Lacey Police Department was tasked with investigating the death of the young man.  The City's own investigation file evinces a pattern of neglect and deliberate indifference inside Nisqually Jail.  On or about August 7, 2016, Plaintiff was arrested in Lacey on suspicion of misdemeanor shoplifting and transported directly into Nisqually Jail.  Since that day, the City has been prosecuting Plaintiff under Thurston County District Court case number 6Z0120236.  There may be an additional case number tracking.

Plaintiff languished 19 days in this sovereign jail before having a stroke in general population.  Millikan Decl. Ex. C.  During his intake and throughout his captivity, jail personnel were repeatedly notified of Plaintiff's severe risk of potential stroke, his chronic CPOD, congestive heart failure, and related conditions and needs.  All jail personnel were on notice of and indifferent to Plaintiff's medical history and extensive list of medications.  Jail personnel admitted Plaintiff directly to general population without medical clearance or observation, and without his medication on hand.  They later refused to administer his prescribed blood thinner medication, his nitro

TRO MOTION

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **4** of 18

medication, his inhaler, possibly other medications, and to provide a CPAP machine for his obstructive sleep apnea.

Plaintiff made multiple requests for his medication while in Nisqually Jail, including by oral demand and through the electronic 'kite' system.  Plaintiff was housed on a floor mat in a general population block far from medical services and without evaluation of the risk to his health.  On or about August 25, 2016, after repeatedly alerting staff of what was about to happen, Plaintiff suffered a severe stroke while he slept.  Rather than considering Plaintiff's stroke-induced exodus from the sovereign stockade befitting of a 'personal recognizance' release, the prosecutor placed Plaintiff on bench warrant status.  He has therefore been in constant fear and jeopardy of being whisked from the nursing home or local courthouse back into Nisqually at the whim of police until the Court provides injunctive protection or the City voluntarily dismisses.

**Facts necessitating emergency injunctive relief.**

Plaintiff's public defender has, at the request of undersigned counsel, been attempting to secure either a dismissal or a pendente lite guarantee that any future plea agreement will not result in Plaintiff's return to the sovereign Nisqually Jail.  Beyond quashing the warrant, these efforts have failed.  Even if the City had promised to make such a sentencing recommendation, there is no guarantee that the Thurston County District Court would follow it.  Plaintiff's next pretrial hearing is in Thurston County District Court on Monday, February 25, 2019 under case number 6Z0120236. Assuming credit for time served, Plaintiff could be returned to sovereign custody for 345 days.

### III.   ARGUMENT SUMMARY

Though the lawsuit arises from several violations of Plaintiff's Constitutional rights, this motion is centered on the predicate illegality of the Nisqually Jail Service Agreement, from which

TRO MOTION

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **5** of 18

all subsequent infringements flow.  Municipalities cannot lawfully remand United States citizens into detention in sovereign jails, replacing the Constitution with a contract.  Indian tribes do not have jurisdiction over non-Indians except under rare and cursory circumstances not present in this case, and only an act of Congress could change that.  The Nisqually Jail Service Agreement cannot.

## IV.   TRO FACTORS APPLIED

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 17 (2008).  The first prong, likelihood of success, is met if "there are serious questions going to the merits…."  Lopez v. Brewer, 680 F.3d 1068, 1072 (9th Cir. 2012).

### 1.  Likely success or serious questions on the merits.

This may be the first case in United States history arising from a local government's internment of non-Indians in an Indian tribe's jail.  Therefore, no case is directly on point with the facts.  However, "there can be the rare 'obvious case,' where the unlawfulness of the…conduct is sufficiently clear even though existing precedent does not address similar circumstances."  District of Columbia v. Wesby, 138 S.Ct. 577, 590 (2018).  This is one such rare obvious case.

While the Agreement is rife with ambiguities and standards of care that fail the tests of both Constitutionality and negligence, the Court need not reach the contract terms.  Nor is it relevant that the defendants believe they have a theory justifying the Agreement under state law.  The

TRO MOTION

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

following federal authorities prohibit both the contractual arrangement and any notion that state law could serve as the authority for it.[2]

      **a.  General lack of tribal jurisdiction.**

It is beyond debate that Indian tribes are "'domestic dependent nations.'"  <u>American Vantage Companies, Inc. v. Table Mountain Rancheria</u>, 292 F.3d 1091, 1096 (9th Cir. 2002) (quoting <u>Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe</u>, 498 U.S. 505, 509 (1991)). They are not, therefore, citizens of the state in which they are located.  <u>Id</u>.  Nor do tribes have criminal jurisdiction over non-Indians.  See <u>Oliphant v. Suquamish Indian Tribe</u>, 435 U.S. 191, 204-05, 211-12 (1978).[3]

In considering whether tribes could take criminal jurisdiction over non-tribal individuals, the <u>Oliphant</u> Court noted the insufficiency of the Indian Civil Rights Act to protect them.  435 U.S. at 212.  Moreover, the Court recognized that the impropriety of imposing the full panoply of United States laws on these quasi-sovereign nations is an impropriety that flows both directions, such that imposition of Indian Law on the non-Indian is equally impermissible.  <u>Id</u>.

Power to make treaties with and regulate tribes is strictly federal.  See e.g.  <u>United States v. Lara</u>, 541 U.S. 193, 200-204 (2004) (analogizing tribes to protectorates like pre-statehood Hawaii, the Northern Mariana Islands, and Puerto Rico; explaining the Treaty Power appears in Article II but is mostly held by Congress).  After the 1953 passage of Public Law 280 ("P.L. 280"),

---

[2] Though not necessary in light of federal authority, former Washington State Attorney General, Rob Mckenna, has published a legal opinion as to why state law also does not permit the Agreement.  Millikan Decl. Ex. D.

[3] Before the 1991 amendment to the Indian Civil Rights Act, tribal authorities did not even have jurisdiction over members of other tribes for crimes committed within each other's respective territorial jurisdiction.  See 25 U.S.C. § 1302(2).

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Washington State did temporarily assume -from the federal government- some criminal jurisdiction over some tribes, while other tribes (Nisqually among them) voluntarily requested it.  See RCW 37.12.100 -.130.

The closest thing to Indian jurisdiction over non-Indians is an offshoot of the state laws that were enacted after P.L. 280.  Under RCW 10.92.020, certain tribal officers may qualify to enforce state laws outside the tribal jurisdiction, provided they are properly insured and approved by Department of Enterprise Services, and an interlocal agreement is in place.  See RCW 10.93.070.[4] Irrespective of what these state laws and interlocal agreements purport to do, the Supreme Court has definitively held that there are only two narrow exceptions (neither of which is applicable here) to the "general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers." Montana v. United States, 450 U.S. 544, 565-66 (1981).

**b.  Unlawful Seizure**

The Fourth Amendment "establishes the minimum constitutional 'standards and procedures' not just for arrest but also for ensuing 'detention.'" Manuel v. City of Joliet, 137 S. Ct. 911, 917 (2017).  Violative conduct reaches beyond deprivation of criminal process, to include "when legal process itself goes wrong...." Id. at 918.  Plaintiff's initial arrest was valid on the basis of probable cause, however the ensuing process of remanding him into Indian custody and affording a probable cause hearing only from video feed within that sovereign custody, is a prime example of process gone very wrong.

---

[4] Former Attorney General, Rob McKenna, has published an online brief calling into question the validity of this interlocal scheme.  Available at https://www.documentcloud.org/documents/3245469-McKenna-Opinion.html (last visited Feb. 14, 2019). Millikan Decl. Ex. D.

TRO MOTION

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **8** of 18

1

2    "[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because

3    its manner of execution unreasonably infringes possessory interests protected by the Fourth

4    Amendment's prohibition on 'unreasonable seizures.'"    United States v. Jacobsen, 466 U.S. 109,

5    124 (1984).    The seizure changes from lawful to unconstitutional when "the government's

6    justification [no longer] holds force.    Thereafter, the government must cease the seizure or secure

7    a new justification." Brewster v. Beck, 859 F.3d 1194, 1197 (9th Cir. 2017). "The simple language

8    of the [Fourth] Amendment applies equally to seizures of persons and to seizures of property."

9    Payton v. New York, 445 U.S. 573, 585 (1980).

10          Brewster's vehicle was driven by a person with a suspended license. Brewster, 859 F.3d at

11    1195-97.  The seizure was lawful at its inception but became unlawful when Brewster arrived at

12    the impound and showed proof of ownership.  Id. at 1197.  Assuming Plaintiff's body is worthy of

13    at least the level of protection afforded Brewster's impounded vehicle, the defendants needed "new

14    justification" when Plaintiff was remanded into the sovereign tribal jail (or perhaps at the moment

15    the City's police car crossed into the tribal reservation land).  Brewster, 859 F.3d at 1197.  There

16    was and is no legal justification.[5]

17

18          There are limited situations in which a tribal officer has justification to *briefly* seize a non-

19    tribal citizen.  For instance, when a non-tribal citizen is driving across tribal land, a duly authorized

20    tribal officer may stop the citizen with reasonable suspicion that a law has been violated.  See Bressi

21    v. Ford, 575 F.3d 891, 896 (9th Cir. 2009); see also RCW 10.92.020.  A detention so authorized

22

23

24    _____
      [5] For other examples of lawful seizure gone wrong, see e.g. United States v. Sedaghaty, 728 F.3d 885, 911 (9th Cir.
25    2013) (valid search rendered unconstitutional when exceeds scope of warrant); Horton v. California, 496 U.S. 128,
      133-142 (1990) (it is even unconstitutional to exceed the scope of *exceptions* to the warrant requirement); Demery v.
26    Arpaio, 378 F.3d 1020, 1039 (9th Cir. 2004) (discussing cases were a "perp walk" has  rendered and otherwise lawful
      seizure unconstitutional).

TRO MOTION                                          **LAW OFFICE OF JACKSON MILLIKAN**
                                                             2540 Kaiser Rd.
                                                             Olympia, WA 98502
                                                          Telephone: (360) 866-3556
                                                          Jackson@MillikanLawFirm.com

may last only for "the amount of time it takes to determine that the violator is not an Indian…[or]…the officer may detain the non-Indian for a reasonable time in order to turn him or her over to state or federal authorities" where so authorized and justified. Id. In these cases, the brief detention for tribal status determination can only be extended for "obvious violations, such as alcohol impairment…" but not for further investigative purposes. Id. at 896-97.

In the case at bar, the tribal defendants identified Plaintiff as a non-tribal citizen and did the opposite of expeditiously remanding him to state authorities. Rather, they held him captive for 19 days while depriving him of medication, which resulted in a severe stroke. Though factually and bureaucratically absurd as it might appear, the only lawful act would have been to pass Plaintiff right back into the City's custody upon the realization that he is not a tribal member.

Nor did Plaintiff commit any crime on tribal land or evince any suspicion of wrongdoing observable by tribal officers enforcing any law. Even if the tribal defendants have been authorized to enforce state law, they simply were not doing so (though they clearly believed themselves to be colored with state authority over state detainees). Plaintiff was cited in the City by a city Police officer. Millikan Decl. Ex. E.

### c. Due Process violations

Procedural due process is required to some degree when the government endeavors to "deprive individuals of 'liberty' or 'property' interests…." Mathews v. Eldridge, 424 U.S. 319, 332 (1976). In determining the process owed a person under any "particular situation," courts generally follow a three-factor balancing test. Cafeteria Workers v. McElroy, 367 U.S. 886, 895 (1961). Procedural due process cases typically include the added considerations of how formal and

TRO MOTION

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **10** of **18**

searching the adjudication must be and whether it is owed before or after the deprivation.  <u>Mathews</u>, 424 U.S. 319, 334.[6]

Because Plaintiff's deportation was not effectuated as a matter of criminal procedure, but rather as a creature of unlawful contract, the <u>Mathews</u> test is most appropriate.  Moreover, deportation "proceedings are civil in nature."  <u>Padilla v. Kentucky</u>, 559 U.S. 356, 365 (2010). "Under the <u>Mathews</u> balancing test, a court evaluates (A) the private interest affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental interest at stake." <u>Nelson v. Colorado</u>, 137 S. Ct. 1249, 1255 (2017).  Because the injunction factors overlap due process analysis, this section will contain a general discussion and leave the balancing tests for the sections that follow.

Internment of detainees and prisoners in a sovereign nation is drastic, likely unprecedented, and legally similar to deportation, exile and banishment.[7]  It has long been settled that interstate transfer of convicted prisoners -who retain only a "residuum of liberty"- does not implicate a liberty interest. <u>Olim v. Wakinekona</u>, 461 U.S. 238, 245 (1983).  Yet even the residuum of liberty retained by convicted persons is offended by "extreme changes in the conditions of confinement" imposed

---

[6] A separate analysis is used when "assessing the validity of state procedural rules which…are part of the criminal process." <u>Medina v. California</u>, 505 U.S. 437, 443 (1992).  This type of case usually turns on the minutia of state criminal procedures such as processes for "postconviction relief," burdens of proof at trial, and "burden to prove incompetence…." <u>DA's Office v. Osborne</u>, 557 U.S. 52, 69 (2009); <u>Medina</u>, 505 U.S. at 445-46 (citing <u>Patterson v. New York</u>, 432 U.S. 197 (1977)).

[7] In <u>Padilla v. Kentucky</u>, the Court held that the Sixth Amendment right to effective counsel includes the right to advice about immigration consequences of plea agreements offered to noncitizens.  559 U.S. 356, 361 (2010).  In finding that defense counsel's silence as to possible deportation is just as ineffective as affirmative mis-advice, the Court equated such deportation with "exile from this country…." <u>Id</u>. at 370.  Moreover, the Court tied deportation, banishment, and exile together as "equivalent." <u>Id</u>. at 373-74.

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

by a sentencing court, "such as involuntary commitment to a mental institution." <u>Chappell v. Mandeville</u>, 706 F.3d 1052, 1063 (9th Cir. 2013).

Plaintiff was a pretrial detainee at all times relevant to this lawsuit, and he may become a prisoner if a plea-change or guilty verdict is entered.  Heretofore Plaintiff has been "presumed innocent" and should not have "been constitutionally deprived of his liberty" interest without his due process.  <u>DA's Office v. Osborne</u>, 557 U.S. 52, 69 (2009) (quoting <u>Conn. Bd. of Pardons v. Dumschat</u>, 452 U.S. 458, 464 (1981)).  Yet even if Plaintiff becomes a convicted person, internment in Indian custody would be an extreme 'change' in sentencing requirements -indeed more extreme than a mental hospital on American soil.  See <u>Chappell</u>, 706 F.3d at 1063.  It is important to gauge this 'change' not from a corrupt bureaucratic status quo, but from the Constitutional rights underlying any just sentencing procedure.

Even detainees with the designation "enemy combatant" are whisked from Guantanamo Bay to detention facilities in the United States upon discovery of the American citizenship.  See e.g. <u>Hamdi v. Rumsfeld</u>, 542 U.S. 507, 510 (2004) (repatriation discussed only as a background fact, but likely grounded in the AUMF language).  Even as to rights owed non-citizen enemy combatants, the Supreme Court has held that Constitutional protections are ensured by "the obvious and uncontested fact that the United States, by virtue of its complete jurisdiction and control over the base, maintains de facto sovereignty over th[e] territory." <u>Boumediene v. Bush</u>, 553 U.S. 723, 755 (2008).  The same cannot be said for the Nisqually Indian Tribe.  See  e.g. <u>Oliphant</u>, 435 U.S. at 210-21.

While Nisqually may not be as foreign as Canada or Mexico, it is undisputed that Plaintiff is not a citizen thereof.

TRO MOTION

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

1
2
3
4
5
6

   Citizenship in this Nation is a part of a cooperative affair. Its citizenry is the
   country and the country is its citizenry. The very nature of our free government
   makes it completely incongruous to have a rule of law under which a group of
   citizens temporarily in office can deprive another group of citizens of their
   citizenship. We hold that the Fourteenth Amendment was designed to, and does,
   protect every citizen of this Nation against a congressional forcible destruction of
   his citizenship, whatever his creed, color, or race. Our holding does no more than
   to give to this citizen that which is his own, a constitutional right to remain a citizen
   in a free country unless he voluntarily relinquishes that citizenship.

7   Afroyim v. Rusk, 387 U.S. 253, 268 (1967).

8     The City shockingly infringed Plaintiff's American citizenship to save a buck. Plaintiff has

9  a fundamental right to remain on the soil of his citizenship during all phases of criminal process.

10  This includes what may come at the resolution of his pending criminal matters.

11    Finally, the City has attempted to contract away Plaintiff's Constitutional rights.  In a

12  retributivist sense, "performance under the contract would necessarily and directly benefit"

13  Plaintiff, qualifying him as a third-party beneficiary.  Tacoma Auto Mall, Inc. v. Nissan North

14  America, Inc., 169 Wn.App. 111, 131 (Div. 2, 2012) (citation omitted).  This may be helpful in

15  seeking damages, however the fundamental policy rationale underlying third-party beneficiary

16  status is also prima facie proof that Plaintiff was deprived of his due process.  His signature does

17  not appear anywhere on the Agreement, nor was he consulted or permitted to vote on its execution.

18    **2.  Likely to suffer irreparable harm absent relief.**

19    "It is well established that the deprivation of constitutional rights 'unquestionably

20  constitutes irreparable injury.'" Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting

21  Elrod v. Burns, 427 U.S. 347, 373 (1976)).  This prong is similar to the analysis for standing to seek

22  an injunction in that both look to whether the movant is "likely to suffer future injury…." City of

23  Los Angeles v. Lyons, 461 U.S. 95, 105 (9th Cir. 1983).  In Lyons, the plaintiff needed to

24
25
26

TRO MOTION

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **13** of **18**

allege that he would have another encounter with the police but also... (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner.

Id.   The City's unconstitutional policy of sending *all* its misdemeanor detainees and prisoners to Nisqually is enshrined in the Agreement. Dkt. #9, pp. 21-22; 22-27 ("the Nisqually Jail has been the primary source for prisoner housing of misdemeanor crimes."; "no alternative is currently available in Thurston County").  Plaintiff is already in jeopardy of being sent back into Nisqually Jail under the pending charges, without even participating in any prerequisite future culpable behavior.  Plaintiff is charged with theft in the third degree.  As a gross misdemeanor, the criminal court has discretion to sentence him up to 364 days in custody.  RCW 9A.20.021(2).  If credit is granted for time already served in Nisqually, then Plaintiff could spend 345 more days in the same sovereign captivity that ended his ability to walk after only 19.

By the black letter of the Agreement, if Plaintiff is again incarcerated in Nisqually he will be subjected to the same indifference as before.  Because the ICRA does not apply to non-natives and the Bill of Rights does not govern Indian conduct on Indian land, and because it remains to be seen whether the tribe can even be sued for violating the rights of its non-native captives, the Agreement is the only protection Plaintiff can expect.  Rather than the Constitution, Plaintiff has only a double indemnification clause to protect him.  Dkt. #9, pg. 26.  This is cold comfort given that "Care" means nothing but "room and board" and treatment equal to "other prisoners."  Dkt. #9, pg. 27.

If Plaintiff experiences another medical emergency, he will be once again subjected to the medical protocols of the Agreement, which require Nisqually to "make the best efforts to contact

TRO MOTION

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **14** of **18**

Lacey" before providing emergency care.  If past is prologue, Plaintiff can expect to be completely ignored overnight until any medical emergency has run its course.   Nor can Plaintiff fairly participate in plea negotiations knowing that any more time served in Nisqually may constitute a death sentence.

Additionally, any future unconstitutional captivity in Nisqually will necessitate an added claim for Eighth Amendment cruel and extremely unusual punishment.  If repetition of the pretrial Due Process violations and unreasonable seizure, plus the inevitable unconstitutional deportation are not sufficient harm for a TRO, there is also substantial medical authority for the proposition that the fear associated with returning to the situs of his last stroke, could cause Plaintiff another cardiovascular episode.[8]

### 3.   Equities favor injunction.

First, Plaintiff only seeks a TRO upholding his rights as to *where* and not as to whether the City may imprison him in the future.  Therefore, the 'undue interference' considerations of the Younger v. Harris line are not implicated.  401 U.S. 37 (1971).  Moreover, Plaintiff seeks this relief narrowly as to only himself.  This initial request has the happy coincidence of educating the City as to what the future may hold, providing notice of, and the legal framework for, any future action it must take.

Second, Plaintiff is only asking for recognition of the rights he already possesses.   In Humphries v. County of L.A., the plaintiffs were erroneously placed on California's child abuser

---

[8] See e.g. National Institute of Health website stating "there are extensive data concerning stressors' contributions to diverse pathophysiological changes including sudden death, myocardial infarction, myocardial ischemia, and wall motion abnormalities, as well as to alterations in cardiac regulation as indexed by changes in sympathetic nervous system activity and hemostasis." Joel E. Dimsdale, MD.  J Am Coll Cardiol. 2008 Apr 1; 51(13): 1237–1246, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2633295/.

TRO MOTION

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

database.  554 F.3d 1170, 1175-76 (9th Cir. 2009).  The court held the lack of a procedure to challenge one's inclusion in the database was a due process violation.  Id. at 1176, 1201.  The court was careful not to weigh the abuser database itself against the plaintiffs' interests, but rather the government's preference of having no formal mechanism to challenge the database.  Id. at 1194. The court held that such costly and time consuming administrative and fiscal burdens were "precisely the sort of administrative costs that we expect our government to shoulder."  Id.

Plaintiff does not question the City's interest in housing pretrial detainees and prisoners. However, the cost of a deportation hearing or similar process -or the alternative of housing detainees somewhere in the United States Proper- cannot be heard to move the balance against the weight of Americans' right to be kept and tried in the Homeland.  The City "has not provided any evidence that the process required to [adjudicate the legality of deportation or use alternative means of detention] is any more burdensome than the process due in any other context."  Id.

"Financial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard prior to some administrative decision." Mathews, 424 U.S. at 348. In other words, there must be something more than the City's financial interest on the balance opposite Plaintiff's civil rights.  Here, the City's budget is the one and only government concern. When the City decided to allow rampant 'big box' retail development interspersed with budget residential construction, it shunned the concomitant responsibility of accounting for the social costs. Explosions of population (especially of the lower income demographic) and commerce naturally and foreseeably correlate to more crime.  Compared to building a jail and employing staff, the millions spent under the Nisqually Jail Services Agreement was a cheap deal.

TRO MOTION

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **16** of **18**

However, Plaintiff Kevin Michael Bell is a human being and an American citizen who should not have been subjected to the unconstitutional machinations of the City's cheap deal.  If the City chooses to place petty misdemeanants in pretrial detention instead of handing them a citation and summons, then the City must bear the fiscal burden of constitutional compliance (perhaps the big box stores could even shoulder some of the cost by investing in more theft prevention).  Should Plaintiff be found guilty, the burden of placing him on electronic home monitoring or renting a bed in the county jail will be a nullity.  As a practical matter, a TRO might turn out to be nothing more than a 'comfort order' because sentences for petty theft are typically close to the 19 days already served.

**4.  Injunction is in the public interest.**

The City of Lacey has contracted away the constitutional rights, not just of Plaintiff, but of its entire population of nearly 50,000 citizens.  This systemic infringement is spreading to neighboring municipalities as well.  A narrow TRO specific to Plaintiff and directed at the City will encourage all cities to correct their behavior well in advance of an ultimate decision on the merits, minimizing the legally insignificant administrative and fiscal burdens discussed above.

## VIII.    CONCLUSION

"An illegal contract is void even if both parties knew of the illegality at the time of formation."  Bankston v. Pierce County, 174 Wn.App. 932, 938-39 (2013).  Beyond the illegality of it, the Agreement purports to usurp the Washington State and United States Constitutions as they pertain to and protect pretrial detainees and prisoners.

The Court should grant a Temporary Restraining Order and note a date for consideration of a Preliminary Injunction.  Because of the arcane body of law surrounding non-native captivity in

TRO MOTION

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

native jail, the Court should also entertain motions to extend the order and briefing deadlines in the coming weeks.  The TRO should prevent Kevin Bell from being remanded into Nisqually Jail or any other tribal jail pending a ruling on the merits.  Therefore, Plaintiff respectfully requests a TRO and any other such relief as the Court finds proper.

Respectfully Submitted,

/s/ Jackson Millikan 2/19/2019
By_____
Jackson Millikan, WSB# 47786
2540 Kaiser Rd NW
Olympia, WA 98502
360.866.3556
Jackson@MillikanLawFirm.com

DECLARATION OF SERVICE

On this ___19th___ day of February, 2019, I, Jackson Millikan, attorney in good standing and counsel for Mr. Bell, declare under penalty of perjury in accordance with 28 U.S.C. § 1746 that I notified all counsel of record that this motion would be forthcoming by:

1. Including notice in the Complaint.  Dkt. #9, pg. 15
2. Emailing all counsel on 2/17/19 that I would be filing in the coming days
3. Emailing all counsel on 2/18/19 a pdf watermarked draft of this motion
4. Filing and thereby electronically serving the final draft and Millikan Declaration with exhibits via ECF on 2/19/2019

/s/ Jackson Millikan
By, _____
Jackson Millikan, Esq.

TRO MOTION

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com