Hon. Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

KEVIN MICHAEL BELL

          Plaintiff,

   v.

BETHANY SWEET individually

          Defendant.

NO.  3:18-cv-05918-BHS

MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY

**Noted on Motion Calendar: 3/12/2021**

## I.    FACTS

This case arose when Mr. Bell was arrested in City of Lacey by the Lacey Police Department and placed into the Nisqually Indian Tribe's jail pending trial, where his most vital medications were not administered for over a week, resulting in strokes.  Nisqually is the City's subcontracted jail featuring a 300-inmate maximum occupancy, and there is no Lacey Jail.  Dkt # 91-1; Ex. F at 50:17.  All defendants have either settled or been dismissed by this Court, with the sole exception of the jail's contracted physician, Bethany Sweet, MD.  Ex. A[1]  The only remaining claims are for

---

[1] All exhibit ("Ex.") citations refer to the contemporaneously filed Declaration of Millikan.

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
www.MillikanLawFirm.com

negligence and deliberate indifference.  This motion concerns only the question of liability for deliberate indifference under the Due Process Clause of the Fourteenth Amendment.  Causation and damages are not in issue.

**1.  *General factual background.***

Mr. Bell alleges that Dr. Sweet, as the sole jail physician, is liable for omitting a timely examination of himself or his medical record, and for entrusting his care to unqualified individuals. Mr. Bell also alleges supervisory liability predicated on the acts and omissions of Dr. Sweet's subordinates, the supervision and training of whom Dr. Sweet has emphatically repudiated.  In the pre-dawn hours of August 26, 2016, Mr. Bell suffered a stroke in the jail and was transported to the hospital where he suffered another.  Ex. I, P.

The jail was on notice of Mr. Bell's several chronic illnesses and complex history.  As noted by Mr. Bell's expert, Dr. Jennifer L'Hommedieu Stankus, Esq., at the time of Mr. Bell's arrest, he was suffering from "a history of asthma, hypertension, four heart attacks, three strokes, and congestive heart failure." Ex. B at 6.[2]  Mr. Bell had suffered his most recent heart attack in June before his arrest of August 7, 2016.  The jail had two procedures for ascertaining the medications of incoming detainees: (i) an intake screening form and (ii) an electronic 'kite' system.  Ex. E at 24:23-26:6; 41:10.  There was no medical screening by medical personnel at any point.

**2.  *The intake screening.***

The August 7th intake form was completed by dismissed corrections officer Stevenson, who did not list any medications and described Mr. Bell as "F" for female.  Ex. C at Bates 0180; Ex. F

---

[2] Erroneously included portions of the Stankus Report have been redacted because they opine as to the ultimate legal issue of deliberate indifference.  With apologies of undersigned counsel.

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **2** of 25

at 17:22-23:14.  Mr. Bell's several chronic medical problems were, however, clearly listed on this intake form and those of several prior detention periods.  Ex. C at Bates 0179 ("1 month ago stroke heart attack").  No medical staff or medically trained correctional staff participated in the intake screening.  Ex. F at 15:23, 18:15.  Though disputed by the Intake Officer[3] and the jail's Certified Medical Assistant ("CMA"),[4] Mr. Bell remembers that he also disclosed that he was on several medications.  Ex. D at 46:16.[5]  This brief will not rely upon any of Mr. Bell's contentions.

The jail also had two previous intake screening forms on file for Mr. Bell, as well as past medication orders and a thick hospital file.  Ex. C.  The prior intakes were kept at the jail and available to staff.  Ex. E at 44:2 (CMA testified, "[y]eah, we had files for them.").  The documents in Mr. Bell's file were dated between six and 18 months before Mr. Bell's August 2016 detention and contained most of the medications withheld.  Ex. C.  They provided a comprehensive summary of the chronic health emergencies and ailments that preceded his "1 month ago stroke heart attack" noted by the Intake Officer.  The prior intake form notations included "i/m has…two strokes" on the January 2015 form, "heart attack 2-3 weeks ago" on the October 2015 form, and "recent heart attack, 3 strokes, high blood pressure," on the February 2016 form.  Ex. C at Bates 0312, 0323, 0218.

Mr. Bell was booked into general population without further medical assessment.  Ex. F at 18:15.  The Intake Officer believed that Mr. Bell's intake form was "[i]mmediately" forwarded to

---

[3] For simplicity, this briefing will refer to the dismissed defendant Corrections Officer, Jamal Stevenson, as "Intake Officer."

[4] For simplicity, this briefing will refer to the dismissed defendant Certified Medical Assistant, Tabitha Hicks (formerly Tabitha Connolly) as "CMA."

[5] Mr. Bell's arguments will obviate the issue because his proper timely medical assessment would have resulted in provision of his medications, irrespectively of whether he disclosed them along with his disclosure about his strokes and heart attacks.  See also Ex. B at 6.

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **3** of 25

the CMA, who he described as the "go-between…[who would] take it to the doctor…." Ex. F at 18:6, 14:25-15:3.   The Intake Officer did not know what type of medical credential the "go-between" had. id. at 15:6.   The CMA testified that the blank signature line at the bottom of the August 7, 2016 intake form, entitled "Medical Staff Signature," meant "the corrections officers never gave [her] these forms ever.  I never got these forms." Ex. E at 37:3.

**3.** *Mr. Bell's kites*

Contrary to written jail policy, there were never automatic medical screenings after intake. Ex. E at 25:20-26:1; Ex. J at Bates 0037.  Mr. Bell was booked on Sunday.  "There's no health care at the jail on the weekend." Ex. E at 53:18.   When Mr. Bell was told at the pill line that his medications were not available, he sent an electronic kite on August 11th. Ex. G.  This kite stated, "out of my meds" and, regarding the exact name and dosage, "don't know but guards have my bottles." id. at Bates 0196-0197.  The CMA testified that she received the kite on "[t]he 11th" and would have seen it that day unless "it fell on the weekend." Ex. E at 53:13.  August 11th, 2016 was a Thursday.

Growing increasingly worried, Mr. Bell kited again the following Saturday, August 13th, this time elaborating what he had already disclosed during intake: "had stroke and heart attack last month & out of most of my meds."  Ex. G at Bates 00064.[6]  On Mr. Bell's eighth day without medication, the CMA responded to his initial kite, "[t]he doctor will be in tomorrow morning Thursday 8/16/2016 and I've pulled all your empty pill bottles to be filled." id. at Bates 0197.

---

[6] The change of Bates stamp and lower quality of this kite are symptoms of the difficulty Mr. Bell has faced discovering evidence from inside the sovereign Nisqually Indian Tribe and may portend the need for a negative inference jury instruction.  See also n. 9, *infra*.

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

On August 16, Dr. Sweet faxed most of Mr. Bell's prescriptions to Tim's Pharmacy, which provided them the same day. Ex. H at Bates 0205. The following day, the CMA realized that there were two more medications outstanding and promised them by the 18th. Ex. G at Bates 0197. On the 18th, Mr. Bell requested his missing inhalers. id. These were never administered before Mr. Bell's stroke of August 26th. Ex. H at Bates 0211. Dr. Sweet first examined Mr. Bell on August 25th. id. at Bates 0212. Sweet would visit the jail to examine patients a certain number of mornings each week. The exact number depends on who is asked, but once per week seems to be the majority consensus. See Ex. K at 9:24-10:9 (Sweet testified thrice weekly); Ex. E at 39:12 (CMA testified "No, no, no. We had – Dr. Sweet only came one day a week"); Ex. L at 8:8 (Lt. Smith testified "At least once a week"). During Dr. Sweet's absence, there was no medical practitioner on site.

When asked why it took the CMA so long to respond to Mr. Bell's initial kite, Dr. Sweet testified, "I don't know the reason behind why she didn't respond earlier. I don't have access to the system." Ex. K at 29:13. When asked her professional opinion about whether the CMA should have immediately forwarded the information in the second kite, Dr. Sweet stated, "[t]hat should have been brought to my attention, yes." Id. at 29:24-30:3. The jail's Medical Administration Records ("MAR") indicate Mr. Bell was denied his most critical medications from August 7 to August 15, (nine days inclusive), received some others sporadically, and others not at all. Ex. H at Bates 0208-0211.

Though this motion for summary judgment does not place causation in issue, Mr. Bell's expert neurologist, Dr. Stan Schiff, has opined that the deprivation caused Mr. Bell's strokes. Ex. I. This expert opinion is, however, relevant to establishing certain elements of liability (e.g. that

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **5** of 25

Dr. Sweet put Mr. Bell at "substantial risk of suffering serious harm."  Ninth Circuit Pattern Instruction 9.30).

**4.  *Dr. Sweet's administration of the medical program.***

Dr. Sweet contracted "to provide services for the Nisqually Public Safety Corrections Facility" for "*five thousand* dollars per month…."  Ex. A.  Her contract duties included "inmate/patient consultations, exams, medication reviews, medication ordering, maint[enance of] medical records and charts," and to "develop, establish, and monitor treatment plans…."  Ex. A at ¶ 4.  Presumably, the relevant standards of care and common sense would dictate that the services be timely provided.

Upon or shortly after contracting with the tribe, the jail's Lt. Smith (also a dismissed defendant) emailed Dr. Sweet a copy of the Nisqually Corrections Policy and Procedure Manual.  Ex. J; Ex. K at 22:19-23:14.  The policy defines "Health Care Authority (HCA)" as "[a] licensed medical physician with whom the facility contracts for the provision of medical services to the inmates…," and assigns to the HCA many of the same duties listed in Dr. Sweet's contract, as well as those of statutory and common law.  Ex. J at Bates 0012.

Dr. Sweet testified, and the CMA agreed, that the two comprised the entirety of the jail's medical department.  Ex. K at 6:15; Ex. E at 14:19-15:1.  Dr. Sweet has repeatedly stated that she did not supervise the CMA or believe she had any contractual or legal duty to do so.  Ex. K at 13:24-14:4, 15:1-16:25.  The jail policy includes the CMA among "Health Personnel…who provide services to inmates usually ordered by a physician."  Ex. J at Bates 00012.  The Washington State Business and Professions Code prohibits the CMA from performing tasks without delegation and

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

in-person "supervision of a health care practitioner" and forbids those tasks "requiring the exercise of judgment based on clinical knowledge."  RCW 18.360.010(11); 18.360.050(1); 18.360.060(1)(i).

Dr. Stankus, Esq. has opined that the jail policy "dictates when care must occur and by whom" and that "as the sole licensed medical physician, [Dr. Sweet was responsible] for knowing and following its content."  Ex. B at 2.  The policy calls for a "Medical Intake Screening…conducted by a member of the medical staff…to identify obvious ailments or injuries and reduce aggravation…."  Ex. J at Bates 00037.  The policy also calls for "timely health appraisal for each inmate…[including a] complete medical screening within 24 hours of admission…."  id. Mr. Bell never received an intake screen by any medical staff or medically trained corrections staff.

Dr. Sweet testified that she was unaware of statutory authority governing her working relationship to the CMA. Ex. K at 16:4.  She repudiated the notion that she was the HCA or that the jail policy governed her conduct.  Dr. Sweet responded to questioning about jail protocols by stating, "[e]verybody runs their medical practice a little bit differently, so what [Sweet's predecessor's] protocol may have been may not be mine…I treated patients as I felt proper in my medical expertise…."  Ex. K at 20:16.  In summary, Dr. Sweet has apparently sought to defend her case by declaring the deliberateness of her own indifference, asserting it in the nature of an affirmative defense.

## II.    MOTION

Mr. Bell moves this Court to find that Defendant Dr. Sweet, as the jail physician, was deliberately indifferent to Mr. Bell's serious medical needs.

Alternatively, Mr. Bell also moves the Court to find that Dr. Sweet, as the supervisor and sole health care authority, was deliberately indifferent to Mr. Bell's serious medical needs.

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **7** of 25

1

## III.   ARGUMENT

2

Mr. Bell will establish that the liability portion of his deliberate indifference claim is beyond

3

any triable question of fact and that this Court should decide the issue.  The admissions of Defendant

4

Sweet foreclose the need for review by the jury.

5

> Viewing the evidence in the light most favorable to [Dr. Sweet], the non-moving party,
> the court must determine whether there are any genuine issues of material fact such that a
> reasonable jury could return a verdict for [Dr. Sweet].

6

7

8

Johnson v. Sager, 640 F. App'x 637, 639 (9th Cir. 2016).

9

Jail physicians, even those hired part-time by contract, are considered to be acting "under

10

color of law."  See e.g.  West v. Atkins, 487 U.S. 42, 56 (1988) ("Nor does the fact that Doctor

11

Atkins' employment contract did not require him to work exclusively for the prison make him any

12

less a state actor than if he performed those duties as a full-time, permanent member of the state

13

prison medical staff.").  As to pretrial detainees like Mr. Bell, "the proper standard of review…is

14

one of objective indifference…."  Gordon v. Cty. of Orange, 888 F.3d 1118, 1120 (9th Cir. 2018).

15

In this case, Dr. Sweet objectively should have known Mr. Bell was present in the jail

16

population, had chronic health conditions, and needed his medication.  Dr. Sweet did subjectively

17

know that she was the only licensed practitioner at the jail and that she was letting unqualified

18

individuals manage the day-to-day operations of the medical program.  Ex. K at 6:54-8:14.  This

19

was independently corroborated by two colleagues.  Ex. E at 14:5; Ex. F at 11:7-15:3; Ex. L at 5:3-

20

6:14.[7]

21

22

23

24

25

26

---

[7] Sweet could have called a backup physician if needed, but this never happened and is irrelevant.  Ex. K at 21:9.

MSJ - LIABILITY

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

The objective standard has been incorporated into the pretrial deliberate indifference Ninth Circuit Pattern Instruction ("PI") 9.30, the first three elements of which will form the main organizational structure of the relevant sections of this brief (leaving causation unresolved).

The basic framework is as follows:

the elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious….

Gordon, 888 F.3d at 1125.

There are no genuine issues of material fact preventing this Court from ruling that Dr. Sweet was, herself, deliberately indifferent to Mr. Bell's medical needs.  However, this motion will also apply the relevant elements of supervisory liability found in PI 9.4, followed by the predicate elements of PI 9.30 as to the dismissed CMA and Intake Officer.

A.  **Deliberate indifference.**

Although Dr. Sweet was the sole supervising medical officer, she herself was also deliberately indifferent to the entire class of inmates needing care, and thus Mr. Bell.  Dr. Sweet left an unqualified CMA to ascertain the need for, and decide the urgency of, Mr. Bell's medications.  Dr. Sweet knew of and ratified this unlawful arrangement, which put Mr. Bell in a wheelchair for life.  Dr. Sweet declined to take the myriad available reasonable measures that would have averted this tragedy.

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **9** of 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

    1.   **Dr. Sweet made the intentional decisions to leave unqualified staff in charge, to defer to their judgment, and to only see patients referred by them.**

Dr. Sweet did not become aware of Mr. Bell, specifically, until the CMA requested that she write prescriptions.  Ex. G at Bates 0205.  Prior to that, Dr. Sweet's several decisions created multiple risks for Mr. Bell and all medically necessitous detainees.  This constitutes deliberate indifference even under the more rigorous Eighth Amendment standard.  ""[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk ... for reasons personal to him or because all prisoners in his situation face such a risk." Lemire v. California Dep't of Corr. & Rehab., 726 F.3d 1062, 1076 (9th Cir. 2013) (quoting Farmer v. Brennan, 511 U.S. 825, 843 (1970)).  Dr. Sweet's decision to contravene policy, law, and contract put Mr. Bell in a wheelchair for life.

Rather than adhere to the jail policies provided to her, Dr. Sweet "reviewed them briefly and filed them away." Ex. K at 23:23.  The policy entitled, "Administration of Healthcare Services Program" states, "[a]ll matters of medical judgments…are the sole province of the physician under contract with the facility." Ex. J at 1.  It further states, "[a]ll decisions and actions regarding the health care services to inmates are the sole responsibility of health care personnel…." id.  Additionally, it required "a written staffing plan which assures that a sufficient number of qualified health personnel….are available to provide adequate evaluation and treatment consistent with contemporary standards of care." id.

Dr. Sweet was aware that the entire jail medical program consisted only of herself and the CMA. Ex. K at 6:15 ("[The CMA] was the only one with a medical license.").  Despite the policy placing her in charge of the CMA, Dr. Sweet decided to only "see the inmates Nisqually Corrections designated to her." Ex. M at Interrog. 2.  Irrespective of policy, RCW 18.360.050(1) requires that

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **10** of **25**

all duties delegable to the CMA shall be performed "under the supervision" of Dr. Sweet. "Supervision" does not mean coming to the jail weekly for inmates to line up and be examined. Rather, it "means supervision…by a health care practitioner who is physically present and is immediately available at the facility." RCW 18.360.010(11). Instead, Dr. Sweet turned the tables such that the CMA "would receive intake forms and ask Dr. Sweet to look at those that listed medical needs she was concerned about." Ex. M at Interrog. 2.

When asked whether there is oversight inherent in a physician-CMA working relationship, Dr. Sweet responded, "I was not [the CMA]'s employer. She worked alongside me as I needed her to, but I did not have any administrative oversight over her." Ex. K at 15:8. When asked how she arrived at that conclusion, Dr. Sweet stated, "I was a contracted physician and I worked independently…" id. at 15:13. When asked if there is any other authority governing her role vis-à-vis the CMA, Dr. Sweet angrily replied,

Is there some other authority? My job was to take care of the inmates. That was my position. Not to oversee staff.
…
I signed a contract as an independent physician, and that's all I can say about that. …I don't understand your question, sir. What authority are you hinting at?
…
Not that I'm aware of. Not any specific authority. I obviously have a code of ethics that I work by, but not that makes me the supervisor of this medical assistant.

Ex. K at 16:4-16:23.

Thus, it was with her full ethical resolve that Dr. Sweet left Mr. Bell in the hands of corrections officers and a CMA and without his most important medications. It is no wonder that the Intake Officer could not discern the urgency of Mr. Bell's need for proper attention, or that the CMA could not recognize the urgency inherent in the types of medication Mr. Bell was taking.

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **11** of **25**

However, deliberate indifference is Mr. Bell's cause of action and not available to Dr. Sweet as an affirmative defense.

2. ***Dr. Sweet's conduct put Mr. Bell at risk of suffering serious harm.***

One definition of 'serious medical needs' is "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment." <u>Egberto v. Nevada Dep't of Corr.</u>, 678 Fed. Appx. 500, 503 (9th Cir. 2017). Assuming arguendo that Dr. Sweet is a reasonable doctor, she herself stated, when asked about Mr. Bell's medical history and whether it was indicative of a healthy man, "No, it's not." Ex. K at 26:20. When asked whether the CMA should have notified Dr. Sweet about Mr. Bell's health conditions, "[t]hat should have been brought to my attention, yes." <u>id</u>. at 26:24.

Mr. Bell needed his blood thinning and blood pressure medications to maintain his precarious health. Ex. I. Mr. Bell's causation expert, Dr. Stan Schiff, has stated in pertinent part, "being deprived of medical care and proper careful medical monitoring…was a significant causative factor in the devastating stroke…." <u>id</u>. at 1. "Mr. Bell's significant medical problems were identified on intake, and yet he was never evaluated." Ex. B at 5-6.

3. ***Dr. Sweet did not take reasonable or legally required measures to prevent the obvious risks.***

"With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" <u>Gordon v. Cty. of Orange</u>, 888 F.3d 1118, 1125 (9th Cir. 2018) (quoting <u>Castro v. Cty. of Los Angeles</u>, 833 F.3d 1060, 1071 (9th Cir. 2016) (citations omitted)). The required objective mental state is "something akin to reckless disregard." <u>id</u>. (quoting <u>Castro</u>, 833 F.3d at 1071).

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Dr. Sweet has repudiated any obligation under state law or jail policy to ensure Mr. Bell got his medications.  She stands firmly upon her contract, which she believes obligated her only to "address things that were brought before [her]".  Ex. K at 18:16.  Even accepting arguendo that Dr. Sweet is above the law and outside the jail policy, she should reasonably have read the word "timely" into her own employment contract.  This would have compelled her to timely provide "inmate/patient consultations," which would have resulted in timely provision of "medication reviews [and] medication ordering."  Ex. A ¶ 4.  Of course, Dr. Stankus, Esq. opined that Dr. Sweet was both beneath the law and within the jail policies.  A reasonable physician in the State of Washington and the medical program HCA, according to Dr. Stanksus, Esq., would have conducted a "proper medical screening" and "timely health appraisal for each inmate" which would have resulted in Mr. Bell's medications being timely provided.  Ex. B at 3.  Or a reasonable physician might delegate initial timely medical assessment to "a physician assistant."  id.  Of course, without a physician assistant in the jail medical program, "[t]here was only one person…qualified to do this and…that was Dr. Sweet."  id.

Dr. Stankus, Esq. also stated that she "would expect Dr. Sweet to understand that [the CMA] could not practice independent of her direct, on-site supervision."  Ex. B at 4.  Thus, a reasonable physician would ensure Mr. Bell's timely medication administration was facilitated by personnel qualified to assess his needs.  With only a CMA beneath her, Dr. Sweet could merely have sifted through the daily stack of intake screening forms to see who she had under her care.  She could have instructed Lt. Smith to hire a LPN, RN, PA-C, ARNP or some other properly credentialed team member.  In the meantime, Dr. Sweet could have personally screened new inmates.

MSJ - LIABILITY

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page 13 of 25

B. **Supervisory deliberate indifference**.

This section will begin with a general discussion on supervisory liability, then apply the appropriate elements from the supervisory instruction (PI 9.4), excluding those duplicative of the foregoing arguments.  The second element of PI 9.4 -that Dr. Sweet's subordinates caused Mr. Bell's medications to be withheld- is deferred to Section C, *infra* ("predicate deliberate indifference").

Supervisory liability under Section 1983 is not vicarious; rather, it is direct. Thus, supervisory liability exists if the official implements a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind the constitutional violation.  Likewise, a supervisor may be liable for the actions of subordinates if the supervisor had knowledge of violations and failed to act to prevent them.

Marcotte v. Monroe Corr. Complex, 394 F. Supp. 2d 1289, 1297 (W.D. Wash. 2005) (citing Redman v. County of San Diego, 942 F.2d 1435, 1446–7 (9th Cir.1991); Hansen v. Black, 885 F.2d 642, 646 (9th Cir.1989); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.1989)).

Supervisory liability will not attach to defendants who "cannot be supervisors of persons beyond their control."  Felarca v. Birgeneau, 891 F.3d 809, 820 (9th Cir. 2018).  Dr. Sweet's subordinates were well within her statutory and contractual control.  As discussed *supra*, Dr. Sweet's absenteeism and ratification of a CMA-run operation were so deficient as to repudiate Mr. Bell's right to his medications.

1. ***Dr. Sweet's conduct was so closely related to the deprivation of medications as to be the moving force.***

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) …her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting Hansen v. Black, 885 F.2d 642, 646 (9th Cir.1989)).  Dr. Sweet was

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **14** of **25**

personally involved as the only jail physician, making her also contractually and statutorily involved in the administration of medications (and the entire jail medical program). Moreover, her choice to leave an unsupervised Intake Officer in charge of medical screening and a CMA in charge of the jail population was directly causal to the deprivation of Mr. Bell's medications.

Statutory duties are strong evidence of personal involvement. In <u>Starr</u>, the court cited a "California law" requiring the sheriff "to take charge of and keep the county jail and the prisoners in it, and [making him] answerable for the prisoner's safekeeping." <u>Starr v. Baca</u>, 652 F.3d at 1208. In Washington State, there are laws requiring physicians to supervise medical assistants and making physicians answerable for the patient's safekeeping. See also RCW 7.70. Under the Business and Professions Code, it is unlawful for a physician to leave a CMA unsupervised. See RCW 18.360 et seq; Ex. B. "'Supervision' means supervision…by a health care practitioner who is physically present and is immediately available in the facility." RCW 18.360.010(11). Dr. Stankus, Esq. has opined that Dr. Sweet violated state laws in this regard. Ex. B at 4. A practitioner must delegate and supervise the assistant's duties, and not all duties are delegable. RCW 18.360.050. Most importantly, clinical judgments are not delegable to a CMA. See RCW 18.360.050 (Authorized duties); 18.360.060 (Delegation).

All deponents have testified that Dr. Sweet was usually not on the premises. Dr. Sweet, of course, places herself at the jail with the greatest frequency. See Ex. K at 9:24-10:9 (claiming three times per week); Ex. E at 39:12 (CMA testified "No, no, no. We had – Dr. Sweet only came one day a week"); Ex. L at 8:8 (Lt. Smith testified "At least once a week"). Therefore, Sweet was usually not supervising the CMA as required by RCW 18.36. Dr. Sweet's proud and vehemently deliberate indifference left Mr. Bell's medical needs in unqualified hands.

MSJ - LIABILITY

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **15** of **25**

**2.** ***Dr. Sweet set in motion, and refused to terminate, the series of acts whereby Mr. Bell's medications were delayed.***

As the one and only jail physician, Dr. Sweet was also the statutory chief health care administrator. Under Dr. Sweet's absentee watch, detainees would get no true medical screening but only a corrections officer filling out a form. Ex. E at 8:11-9:1, 20:15, 22:3, 24:23-26:1; Ex. F at 15:23, 18:20. If a detainee were fortunate enough to have that form land in the CMA's inbox, then medical care might eventually be administered *provided* that the CMA timely forwarded the issues to Dr. Sweet. Otherwise, inmates would need to utilize the kite system (which Mr. Bell eventually did) in hopes that medical attention be timely provided, which it was not. Even the kite system was dependent on the self-described "middleman" CMA to achieve Dr. Sweet's attention. Ex. E at 18:17.

Dr. Sweet has admitted she was "[n]ot aware of" any other medical personnel in the jail besides the CMA. Ex. K at 11:6. She further admits she had no idea what the CMA's "certifications" would permit her to do and that "no" there is no "add-on" that can augment a CMA's certification. id. at 11:18 Nonetheless, Dr. Sweet stated in her interrogatory responses that she "played no role in [Mr. Bell's] medications administration other than to order…refills." Ex. M at Interrog. 15. She explained that the CMA "would…ask Dr. Sweet to look at those [intake forms] that [the CMA] was concerned about." id. at Interrog. 2.

When questioned about relying on this "CMA concern" test for which inmates received attention, Dr. Sweet stated "I would consider that triage." Ex. K at 13:23. She then testified as to her erroneous belief that "[m]edical assistants can triage patients" and explained that the CMA "worked alongside [Sweet]" without Sweet performing "any administrative oversight over" the CMA. id. at 12:8, 15:8. "My job was to take care of the inmates. … Not to oversee staff." id. at

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **16** of **25**

16:4.  Finally, when asked why it took 18 days before she saw Mr. Bell, Sweet stated "when I showed up, the schedule was already set."  Ex. K at 10:23.

Dr. Sweet testified that, lawfully, "[m]edical assistants can triage patients, yes."  Ex. K at 12:8.  This is unlawful under RCW 18.360.050.  The CMA testified correctly, "No – oh, no, we don't – CMAs cannot triage, no."  Ex. E at 57:3.  Dr. Stankus, Esq. has opined that the CMA "made clinical judgments about who needed to see a medical doctor," which is forbidden to CMAs under RCW 18.36.060(1)(f)(i), requiring that delegated tasks "can be performed without requiring the exercise of judgment based on clinical knowledge."  Ex. B at 4.[8]  The CMA testified that she felt left all alone in the jail but has never felt that way in her community CMA jobs.  Ex. E at 10:18-11:18.  She stated, "I've never worked in a clinic where a provider is not on-site at all times…that's not normal."  id. at 14:25-15:1.

Another inmate's contemporaneous file helps illustrate that Dr. Sweet's medical program was inherently indifferent to serious medical needs and that the CMA was in way over her head.  Ex. N.  When asked about a deceased inmate who had been booked a few weeks after Mr. Bell's strokes, the CMA explained that the timeliness of this gentleman's next-day medical exam was coincidental.  "[T]hat does happen if an inmate comes in like, let's say, on a Wednesday and our provider is scheduled to come in on a Thursday…."  Ex. E at 32:18.  The decedent was booked on September 14, examined by Dr. Sweet on December 15, and received his medications September 16, 2016 for illnesses quite similar to Mr. Bell's. Ex. N at Bates 0323.  Unfortunately, although the dice were cast such that the man won a doctor's exam, he was then left to die.  id. at 0325.

---

[8] CMAs are permitted to perform intake screening in a medical practice because medical attention is inevitable.  RCW 18.360.050(1)(e).  The jail intake, as this case illustrates, does not automatically lead to medical care.

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **17** of **25**

Of this gentleman's prompt receipt of his medications, the CMA testified, "we used Tim's Pharmacy at that time…[which] can either deliver same day or next day.   We always get medications either same day or next day."  Ex. E at 33:12.  Of course, Tim's Pharmacy was also the source of Mr. Bell's prescriptions, most of which arrived nine days after his booking.  Ex. H. at Bates 0208-0211; Ex. I.  Thus, if Dr. Sweet had written the prescriptions at or shortly after the point of Mr. Bell's perfunctory medical screening, he would not have been substantially deprived of them.  Unfortunately, Dr. Sweet erected barriers between herself and Mr. Bell's medical file.

Corrections Lt. Jeff Smith wrote in the deceased inmate's death investigation report that the CMA was apprised of the decedent's "stomach discomfort and 'tasting blood'" but that the CMA "advised if his condition worsened….have him seen in the emergency room."  Ex. N at 2 (Bates NDOC 00324).  The CMA contradicted Lt. Smith's account as to permitting a status quo of tasting blood, testifying "No. No, that would never be acceptable."  Ex. E at 34:18.  Thus, not only was the CMA forced to triage inmates, she was also embattled by apparently fraudulent finger pointing within this dangerous medical program.  The CMA was, by all accounts, a diligent worker forced to perform tasks beyond her ability and training.

Dr. Sweet also breached her contractual duties to provide "inmate/patient consultations, exams, medications reviews, medication ordering, maint[enance of] medical records and charts," and to "develop, establish, and monitor treatment plans, and address other related routine matters associated with inmate health care…."  Ex. J at 1.  Thus, as state law forbids a physician ignoring patients until a CMA invites her attention, neither does Dr. Sweet's contract authorize such indifference.  Dr. Stankus, Esq. has opined that Dr. Sweet was derelict in her duties under all three available sources of authority: state law, employment contract, and jail policy.  Ex. B at 2-4.

MSJ - LIABILITY

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **18** of **25**

Dr. Sweet admitted receiving a copy of the Nisqually Corrections Policy and Procedure Manual, which she "reviewed…briefly and filed…away." Ex. K at 22:23-24:1.  In the opinion of Dr. Stankus, Esq. these jail policies designated Sweet as the Health Care Authority ("HCA"). Ex. B at 2; Ex. J at 1 (Policy defining HCA as "[a] licensed medical physician with whom the facility contracts…."). This title is, of course, vehemently spurned by Dr. Sweet. Ex. K at 37:3. Formalities aside, Dr. Sweet's adamant rejection of the HCA title amounts to a confession of, and dedication to, deliberate indifference to her substantive statutory and contractual duties. In essence, Dr. Sweet claims that because she subjectively interpreted jail policy compliance to be outside her job description, her deliberate ignorance of Mr. Bell was thereby justified. Ex. K at 15:17 ("My contract specifies that my job was to care for the inmates, and that was all"). Even if true, the fact remains that Dr. Sweet left the CMA in charge of the entire jail medical program, including compliance with policy. For her part, the CMA testified "I didn't even know there was a policy." Ex. E at 27:14.

   3.  ***Dr. Sweet disregarded the obvious consequence that leaving a CMA in charge of the daily medical operations would cause Mr. Bell's medications to be withheld.***

   "Deliberate indifference exists when the need 'for more or different' action is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the [supervisor] can reasonably be said to have been deliberately indifferent to the need.'" Hyun Ju Park v. City & Cty. of Honolulu, 952 F.3d 1136, 1141 (9th Cir. 2020) (quoting City of Canton v. Harris, 489 U.S. 378, 390 & n.10 (1989)). "The relevant question here then is whether the facts asserted put Defendant [Sweet] 'on actual or constructive notice that the policy or custom was substantially certain to result in harm to [detainees]." Weger v. Washington State Dep't of Soc. & Health Servs., No. C19-5961 RJB-DWC, 2021 WL 243402, at *4 (W.D. Wash. Jan. 25, 2021)

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **19** of **25**

(quoting <u>Estate of Vela v. Cnty. of Monterey</u>, No. 16-2375, 2018 WL 4076317, at *7 (N.D. Cal. 2018) (citing <u>Castro v. Cnty. of Los Angeles</u>, 833 F.3d 1160, 1076–77 (9th Cir. 2016)).

Dr. Sweet presided over a ghost ship of a medical program that left shattered constitutional rights and bodies in its wake. Nobody but Dr. Sweet was legally authorized to take the helm -a station she nonetheless repudiated. Disregard is inherent in Dr. Sweet's belief that "[t]riage is a medical clinical judgment for a medical assistant to determine whether [an issue] needs to be brought to me or not." Ex. K at 19:6. The risks would be obvious even to a lay person.

Dr. Stankus, Esq. opined that Dr. Sweet "relied on [an] unsupervised medical assistant and/or intake jailers to make judgments about…who should and should not be seen." Ex. B at 3. Stankus further opined that, by not supervising anyone in the jail medical program, Sweet committed a "violation of Nisqually Corrections Policy, Washington State law, and [her] own contract. Dr. Sweet was the only physician working with [the CMA]. She was absolutely the supervising physician." <u>id</u>. at 4. Dr. Stankus, Esq. goes on to state, "Instead, Dr. Sweet denies supervisory responsibilities and says she relied on [the CMA] to tell her who to see and when…." <u>id</u>. The risks could not have been more obvious.

Nisqually Jail was a very dangerous place. Between March 31, 2015 and December 20, 2019 at least seven detainees died in the jail or shortly after emergency medical technicians took over. Ex. N. The jail's "max population" is only 300. Ex. F at 50:12. One young man died four months before Mr. Bell's stroke. Ex. N at Bates 0333.[9] One man died three weeks after Mr. Bell

---

[9] At the time the CMA provided discovery responses, young Mr. Westling's was the only death reported in the media. The answer attributed to the CMA stated that she was only "aware of one death – Andrew Westling." Ex. P at Interrog. 12. However, regarding her discovery response, the CMA testified that she "was present for one death. And that's not this death, and I'm not sure who Andrew Westling is." Ex. E at 30:5. When pressed on whether she had answered the relevant interrogatory, the CMA stated, "no." <u>id</u>. at 30:11.

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **20** of **25**

suffered his stroke. id. at 0323. Though Dr. Sweet was the presiding and sole physician and medical administrator during both Mr. Bell's stroke and the subsequent jail death, she made no change to the medical program. Ex. E at 33:1. Dr. Sweet ran the program like a medical outreach mission to a developing country. When asked if the department was like "on TV where the doctor goes to the village somewhere and then the sick come out and line up at a tent with a big red cross," the CMA answered, "[m]ore or less. So I would get everything ready for the provider, anybody that needed to be seen, and then when she would come in, she would go through that and she would pick the patients that she would see. ... They'd line up and we'd see those people." Ex. E at 16:14. Mr. Bell does not allege the 'sick call' procedure is unconstitutional, but it cannot be the only way to get medical attention and CMAs cannot be left unattended.

Unless and until Dr. Sweet arrived for sick call, the only person with a medically oriented certification was the CMA. The CMA, moreover, was only available "6:00 to [14]:30" and, on the weekend, there was "no medical at all." Ex. E at 60:21-61:3. According to Lt. Smith, the protocol for reacting to the notation on Mr. Bell's intake form, "1 month ago stroke heart attack," was to "make sure our medical unit was aware...the next time they're on site." Ex. L at 14:23-15:8. These obvious endemic delays nearly killed Mr. Bell. Lt. Smith believed that, "based on the policies in Dr. Sweet's contract," there would always be a standard screen by a medical professional within "72 hours" of booking. id. at 16:9. But according to the CMA, there was never a medical screening other than the form filled out by the Intake Officer. Ex. E at 25:20.

The CMA would obviously have no knowledge or training in prioritizing medication prescriptions. When asked if the "name of the medication ha[d] anything to do with the urgency," the CMA replied, "[y]ou'd have to ask Dr. Sweet that." Ex. E at 50:23-51:1. Even if it is true that

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Mr. Bell did not mention medication at the intake (which he denies), his intake form contained enough information for a properly staffed medical department to timely provide for his serious medical needs  Ex. C at Bates 0179 ("1 month ago stroke heart attack").

Dr. Sweet left the CMA in an obviously untenable situation.  The CMA stated, "I don't know why it took 18 days for him to see the doctor.  …It could have been his fault; I don't know."  Ex. E at 47:19.  She also did not know who administered the medications, or even whether they were administered.  Ex. E at 48:13 ("the corrections officers were handing out medications.  …all these [numbers], whatever these are…like a number assigned to a corrections officer….").  It stands to reason that a CMA placed in charge of the entire medical department would blame the victim, not know "if [Mr. Bell] had meds with him or not," or delay responding to Mr. Bell's August 11th kite until August 15th and anticipate Dr. Sweet handling the problem on the 16[th.]  Ex. E at 52:5-55:7.  She was in way over her head.

The medical program headed by Dr. Sweet was so deficient that, after she left, the jail contracted out to Correct Care Solutions (CCS).  Ex. L at 17:19-20:22; Ex. O at Bates 0175.[10]  In an email to his superiors, Lt. Smith described his task after Sweet's exodus as "providing the proper level of…inmate health care…[pursuant to which he] spent nearly ten months trying…[and concluded i]t simply was not feasible" with the system over which Sweet had presided.  id. at 0222.  Where the CMA had previously worked 40 hours per week and no weekends, the CCS contract provided for 252 hours per week and round the clock staffing.  id. at 0190.

---

[10] Evidence of subsequent remedial measures taken by parties other than the defendant is admissible under FRE 407. See e.g. In re Aircrash in Bali, Indonesia, 871 F.2d 812, 817 (9th Cir. 1989).

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

C. **Predicate deliberate indifference of the dismissed CMA and Intake Officer.**

The Intake Officer had no medical credential or training other than basic first aid.  Ex. F at 7:16-8:10; 15:20.  No medically credentialed individual was involved in the medical screening.  Ex. E at 8:11.  No subsequent screening ever took place.  The jail's medical program was, stem to stern, an exercise in textbook deliberate indifference.  There were written policies.  Dr. Sweet renounced them and the CMA did not even know they existed.  Then there were unwritten policies: 1. the CMA does nothing unless prompted by the corrections officers or detainees and 2. Dr. Sweet does nothing unless prompted by the CMA.

**1.** *Intentional decisions of dismissed CMA and Intake Officer.*

It should be reiterated at the outset that Dr. Sweet made the intentional decision to remain absent from the jail most of the time, leaving only the CMA present.  The Intake Officer never notified, or provided the medical screening form to, the medical department (which consisted only of Dr. Sweet and the CMA).  The Intake Officer circled "stroke" and wrote "1 month ago stroke heart attack" on the intake form but curiously circled "no" where the form asks, "Are you currently taking any medication."  Ex. C at Bates 0179.  He also labeled Mr. Bell "F" for female.  id.  The Intake Officer signed the form but the spaces next to "Notification of Medical" and "Medical Staff Signature" were left blank.  id.  The CMA testified that these blanks meant she was never given the medical screening form.  Ex. E at 37:3-37:10 ("officers never gave me these forms ever.").  The crux of the scenario, of course, is that Mr. Bell went without his medications.  Regardless of whose version of medical-screening-hot-potato is correct, Dr. Sweet let this tragic comedy of errors happen.

The CMA relied upon the Intake Officer to notify her if "an inmate came in…and they took a medication or they had any kind of health issues or anything like that…." Ex. E at 8:21.  Once

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **23** of **25**

notified, the CMA would then "speak to the inmate and get all that information…get their record." id. at 8:24-9:1.  The CMA testified that of the frequency and quantity of medical intake forms needing her attention, "[n]o, not too many." Ex. E at 21:9.  Nonetheless, the CMA would only look at the intakes if the Intake Officer notified her.  The CMA testified she was the only person who could forward the kited issues to the physician.  Ex. E at 22:3.  The CMA testified that, had she seen the medical screening form indicating heart attack and strokes, "[t]hat would be something that…we would probably bring him in to see the doctor…." id. at 36:22, 45:23.  Once the CMA became aware of Mr. Bell's missing prescriptions, she did not timely notify the physician, and therefore did not make them available until it was too late to avert disaster.  Ex. G at Bates 0197; Ex. I.

### 2.  *The Intake Officer and CMA did not take reasonable measures.*

The Intake Officer knew Mr. Bell was in very poor health but failed to notify Dr. Sweet and likely did not pass the medical screening form to the CMA.  The CMA claims she never received the intake form and admits she did not immediately forward Mr. Bell's request for medications to the only person authorized to prescribe medications, Dr. Sweet.  Although any reasonable person would likely know that "1 month ago stroke heart attack" meant medical evaluation and medications would be needed, neither the Intake Officer nor the CMA were qualified or permitted under law to exercise medical judgment.

Dr. Sweet was the only licensed practitioner in the jail, and thus the head of the jail's medical program.  Dr. Sweet recklessly disregarded the entire jail medical program, including all incoming detainees.  Any reasonable physician would have apprised herself of the medical conditions suffered by her captive clientele in such manner as to prevent them going weeks without their

MSJ - LIABILITY

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **24** of **25**

1   medications.  Nonetheless, both the CMA and Intake Officer were objectively reckless in failing to

2   contact Dr. Sweet about Mr. Bell's medical need.

3
                                    **IV.    CONCLUSION**
4

5       Whereas Dr. Sweet has admitted deliberate indifference, this Court should enter a summary

6   judgment on liability in favor of Mr. Bell and proceed to trial on only the issues of causation and

7   damages.

8

9

10  Signed on this 12ᵗʰ day of February, 2021.

11                                                  s/Jackson Millikan
                                                    _____
12                                                  Jackson Millikan, WSB# 47786
                                                    Attorney for Mr. Bell
13

14

15

16

17

18

19

20

21

22

23

24

25

26

MSJ - LIABILITY                                     **LAW OFFICE OF JACKSON MILLIKAN**
                                                    2540 Kaiser Rd.
                                                    Olympia, WA 98502
                                                    Telephone: (360) 866-3556
                                                    Jackson@MillikanLawFirm.com