UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| KEVIN MICHAEL BELL,<br><br>        Plaintiff,<br><br>   v.<br><br>CITY OF LACEY, et al.,<br><br>        Defendants. | CASE NO. C18-5918 BHS<br><br>ORDER ON MOTIONS FOR SUMMARY JUDGMENT |

THIS MATTER is before the Court on Plaintiff Kevin Bell's Motion for Partial Summary Judgment on Liability, Dkt. 159, and on Defendant Dr. Bethany Sweet's Motion for Summary Judgment, Dkt. 160.

The case arises from Bell's nineteen-day pre-trial incarceration at the Nisqually Corrections Facility ("the Jail"), operated by the Nisqually Tribe, after the City of Lacey arrested him for and charged him with shoplifting.[1] Bell had a stroke while in the Jail and sued numerous parties for violating his constitutional rights in multiple ways.

---

[1] Lacey does not have its own jail and contracted with the Nisqually Tribe to send its pre- and post- trial detainees to the Jail.

ORDER - 1

The case has been the subject of prior substantive Orders. *See* Dkts. 46, 58, 71, and 136. Bell's claims against most defendants have been dismissed by motion, stipulation, or settlement. Only Bell's 42 U.S.C. § 1983 and negligence claims against Sweet—the physician hired by the Jail to provide specific, limited services—remain. Bell asserts that Sweet was deliberately indifferent to his medical needs, primarily by failing to timely provide him prescription medications, causing his stroke. Bell seeks judgment as a matter of law on Sweet's liability, leaving causation and damages for trial. Dkt. 159 at 2.

Sweet seeks dismissal with prejudice of all Bell's claims against her, arguing that there is no evidence supporting them. She argues persuasively that Bell improperly seeks to make her liable for the Tribe's management of its Jail because the Tribe was dismissed on sovereign immunity. Dkt. 160.

## I.   BACKGROUND

On Sunday, August 7, 2016, Bell was arrested for shoplifting in Lacey, Washington, and was detained at the Jail pending trial. On August 26, he woke up with slurred speech and arm numbness, which he claims were caused by a stroke. Bell had suffered previous strokes, as well as multiple heart attacks. He was transported to the hospital, where, the parties agree, he had a debilitating stroke. He is apparently confined to a wheelchair.

Bell contends that the Jail's sole contracted physician, Sweet, is liable for failing to conduct a timely examination of himself or his medical record, and for entrusting his care to unqualified underlings. His § 1983 deliberate indifference claims are based on

Sweet's failures as a physician and as the supervisor of others who were deliberately indifferent to his medical needs, violating his Fourteenth Amendment rights.

The facts are essentially undisputed, and they are well-documented. Bell contends that the Jail had two procedures for ascertaining the medical needs of its detainees: a medical intake screening form and an electronic "kite" system. He emphasizes there was "no medical screening by medical personnel at any point." Dkt. 159 at 2. He concedes that the intake screening was performed by a dismissed defendant, Stevenson, who made various mistakes on the intake form but still listed Bell's chronic medical problems on it. He points out that he had recently been in the Jail three times (January 2015, October 2015, and February 2016) and that as a result, the Jail already had a record of his medical condition. *See generally* Dkt. 159-1, Ex. C, at 29–57. Nevertheless, he was booked in the Jail's general population without further medical assessment.

He asserts that in the normal course, the intake forms would be sent to the Certified Medial Assistant ("CMA"), Tabitha Connolly. Connolly testified that the lack of her signature on the forms means that she "never got them." Dkts. 159 at 4; 159-1 at Ex. E (CMA deposition transcript).

Four days into his incarceration, Bell sent a kite informing the Jail that he was "out of meds," and that the "guards have his bottles."[2] Dkt. 159 at-1 at Ex. G. He sent another kite on Saturday, August 13, stating he had a stroke and a heart attack "last month" and

---

[2] It is not clear how or when the Jail obtained Bell's empty pill bottles. Sweet demonstrates that Bell's August 7 intake form reflects he was not taking or carrying any medications, was in good shape, and was not under a doctor's care. Unlike the CMA, Bell signed this form. Bui Declaration, Dkt. 161 at 26, Ex. C.

was "out of most of [his] meds." Dkt. 159-1 at Ex. G. The CMA responded on August 15 that the doctor (Sweet) would be in on Thursday, August 16, and that in the meantime she had "pulled all [his] empty pill bottles to be filled." On August 17, the CMA informed Bell that additional missing medications would be available the following day. *Id*. The kites reflecting these interactions are in a table[3] in the record:

| DATE/TIME | USER | ACTION | DETAILS |
|---|---|---|---|
| 08/18/16 19:10 | Kevin Bell | Responded to Staff | thank you your great I usually take two inhalers ventolin & i dont know the other i got them from st petes |
| 08/17/16 16:10 | Tabitha connolly | Staff Response | I see your out of a few more, we have them ordered and the will be in tomorrow 08/18/2016 Ferrous Sulfate Lisinopril Topiramate -Tabitha 08/17/2016 |
| 08/17/16 13:09 | Kevin Bell | Responded to Staff | you rock |
| 08/17/16 09:20 | Tabitha connolly | Staff Response | all your meds will be here today 08/17/2016 -Tabitha 08/17/2016 |
| 08/16/16 14:31 | Kevin Bell | Responded to Staff | thank you |
| 08/15/16 15:09 | Tabitha connolly | Staff Response | The doctor will be in tomorrow morning Tuesday 08/16/2016 and I've pulled all your empty pill bottles to be filled. -Tabitha 08/15/2016 |
| 08/11/16 20:20 | Kevin Bell | Submitted New | medzs |

Dkt. 159-1 at 193.

In any event, it is undisputed that Sweet was not at the Jail full time (she was not hired to be, and Bell repeats that she was there only about once a week) and that she did not personally examine Bell until August 25. She wrote a prescription for his inhalers (Advair and Albuterol, presumably for COPD) and noted his history. She also noted that Bell had elevated blood pressure, and planned to re-visit that issue in a week, after seeing the effect of the Carvedilol (a blood pressure medicine) that he had begun taking two days earlier.

---

[3] Bell's August 13 kite is on the following page of Exhibit G.

ORDER - 4

Bell was transported to the hospital the next morning, August 26. The symptoms he complained of in the Jail "spontaneously resolved," Dkt. 161 at 19, but he was admitted. That night, he had the debilitating stroke which is the basis of this action.

Bell asserts that the Jail's staff, including Sweet, was aware of his medical history and was "repeatedly notified" of his severe risk of potential stroke and other conditions. *See* Dkt. 1-2. He claims that Sweet was deliberately indifferent to his medical needs, and that, as the Jail's *de facto* Health Care Authority ("HCA") and thus a supervisor, she is liable for the deliberate indifference of other Jail staff, including the CMA and the guards responsible for inmate intake. Bell does not seek summary judgment on causation, but implicit in his deliberate indifference claim is the allegation that the delay (from August 7 to August 16 or 17[4]) in providing his numerous medications caused[5] his stroke.

Sweet seeks summary judgment on Bell's deliberate indifference claims and his negligence claims (necessarily, medical malpractice under RCW Chapter 7.70) against her. Sweet argues there is no evidence that she was deliberately indifferent to Bell's medical needs and emphasizes that she promptly prescribed his medications each time she was informed of his need for them. She argues that Bell has no expert testimony

---

[4] Sweet argues the delay was only *four* days, between August 11, the date Bell sent his first kite, to August 15, when the CMA "pulled his medications" and informed him the doctor would be in the following day. Dkt. 168 at 22.

[5] Sweet points out that Bell was demonstrably and routinely non-compliant in taking his medications well before he was incarcerated in August 2016; this fact is reflected throughout his medical records. Dkt. 160 at 4–6; Dkt. 161 at Ex B. Bell had obtained only a 30-day supply of a single medication in 2016 (June), and there is no evidence or claim that he took it. Dkt. 160 at 6 (citing Dkt. 161 at Ex. I). Bell's expert Neurologist, Dr. Schiff, opines that Bell's incarceration itself was the cause of his stroke: "if he had not been in jail, this stroke would not have occurred at this time." Dkt. 159-1 at 210.

supporting a state law medical negligence claim, that his other negligence claims are pre-empted by RCW Chapter 7.70, and that he cannot establish as a matter of law that any failure on Sweet's part caused his injury.

The issues are discussed in turn.

## II.  DISCUSSION

**A.  Summary Judgment Standard.**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of

1  law." *Celotex*, 477 U.S. at 323–24. There is no requirement that the moving party negate
2  elements of the non-movant's case. *Lujan v. National Wildlife Federation*, 497 U.S. 871
3  (1990). Once the moving party has met its burden, the non-movant must then produce
4  concrete evidence, without merely relying on allegations in the pleadings, that there
5  remain genuine factual issues. *Anderson*, 477 U.S. 242, 248 (1986).

6  **B.     Bell's § 1983 Deliberate Indifference Claims**

7  To prevail on a 42 U.S.C. § 1983 claim, the plaintiff must demonstrate that the
8  particular defendant caused or personally participated in causing the constitutional
9  deprivation. *Arnold v. Int'l. Bus. Mach. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981);
10 *Sherman v. Yakahi*, 549 F.2d 1287, 1290 (9th Cir. 1977).

11 Until 2018, the Ninth Circuit employed a subjective test in § 1983 Fourteenth
12 Amendment deliberate indifference cases involving pre-trial detainees, which was
13 consistent with the test applied to convicted inmates under the Eighth Amendment. *See*
14 *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996); *Redman v. Cnty. of San Diego*, 942
15 F.2d 1435, 1440 n.7 (9th Cir. 1991). A plaintiff was required to prove that government
16 officials were subjectively aware of a substantial risk of serious harm and yet took no
17 action. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Simmons v. Navajo Cnty.,*
18 *Ariz.*, 609 F.3d 1011, 1017–18 (9th Cir. 2010). As Sweet correctly asserts, this meant that
19 for an official to know of a substantial risk, it is not enough that she was aware of facts
20 from which an inference could be drawn that a substantial risk exists, but she must also
21 draw that inference. Dkt. 160 at 14 (citing *Farmer*). Sweet notes that this was the law
22 when the events in this case occurred.

1    In 2018, the Ninth Circuit endorsed an objective standard in *Gordon v. Cnty. of
2 Orange*, 888 F.3d 1118 (9th Cir. 2018). *Gordon* held that in order to prove a deliberate
3 indifference claim, a plaintiff must demonstrate: (1) the defendant made an intentional
4 decision with respect to the conditions under which the plaintiff was confined; (2) those
5 conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant
6 did not take reasonable available measures to abate the risk, even though a reasonable
7 official in the circumstances would have appreciated the high degree of risk involved—
8 making the consequences of the defendant's conduct obvious; and (4) by not taking such
9 measures, the defendants caused the plaintiff's injuries. *Id*. at 1125.
10    Sweet argues that Bell has produced no evidence of her deliberate indifference
11 under either the subjective standard that applied when these events occurred or the
12 objective standard which applies now. The undisputed evidence is that Sweet prescribed
13 Bell's medications promptly after learning of his need for them and only examined him
14 the day before his stroke. She determined that his blood pressure was high and wanted to
15 see the effects of his medication and to check back on him in a week. There is no claim or
16 evidence that she should have done something different or better on that date.
17    Indeed, Bell does not directly criticize the care he received from Sweet. He has no
18 expert testimony opining that her care, specifically, was deficient. Instead, he argues that
19 as the Jail's only physician, Sweet was, by process of elimination, the Jail's HCA,
20 responsible for the administration of the Jail's medical program, and the supervisor of
21 other Jail employees who, he claims, failed to ascertain and address the substantial risks
22

he faced without access to his medications. The efficacy of Bell's effort to paint Sweet as the Jail's HCA is the crux of his remaining claims, and it is addressed below.

### 1. Bell's Partial Summary Judgment Motion is Denied.

Bell's remaining § 1983 claim asserts that Sweet violated his Fourteenth Amendment constitutional rights by deliberately ignoring his substantial medical needs. He also argues, more strenuously, that Sweet had supervisor liability for the failings of the CMA, the guards, and the Jail administration itself. This latter claim is based on his assertion that Sweet was necessarily the Jail's HCA; the Jail's own policy required it to have an HCA and required that person to be a licensed physician. Since Sweet was the only physician (and because she and the CMA together comprised the Jail's entire medical staff), she must have been the HCA and as such is liable for the medication delays of which he complains, even if Sweet did not personally know about his ailments or the medications he required. Dkt. 159 at 6.

Bell's claim that Sweet was necessarily the Jail's HCA is supported by the expert opinion of Dr. Stankus, who is both a medical doctor and an attorney. Her report[6] to Bell's attorney is attached to his Declaration, Dkt. 159-1 at Ex. B. Stankus opines that Sweet knew she was the "only licensed medical physician with whom the facility contracts" and that that is the "definition of the HCA" under the Jail's Policy and Procedures Manual (Dkt. 159-1 at Ex. J). She claims that Manual provides that the Jail's Medical Program "shall be managed and directed by an HCA who is responsible for

---

[6] The report is not sworn, but the Court will consider it.

ORDER - 9

clinical supervision of health personnel within the facility, is the sole responsibility [sic] for all final medical judgments relating to inmate care in the facility." Dkt. 159-1 at 11. She opines that, by process of elimination, the only person who could be the HCA is Dr. Sweet, and that "by definition" she was Connolly's supervisor. *Id.*

Neither Stankus nor Bell address the other option, which is that, despite its Policy, the Jail had no HCA and no person or entity in charge of its Medical Program. Sweet was not hired full time, and neither she nor the Tribe agreed that she would take on the HCA role and the burdens and responsibilities that came with it. None of her alleged subordinates claimed she was their supervisor, or that she had any authority over them; they testified they worked for the Jail and that their boss was Jeff Smith. The mere fact that Sweet is a doctor, and the Policy requires an HCA who is a doctor, does not make Sweet the HCA. Sweet's contract and all the other evidence make it clear that she was not the HCA. The consequences of the Jail not having an HCA might be different if it were not immune from suit. But that does not make Sweet liable by default for the Jail's failure to follow its own Policy.

Bell also argues that by claiming she was unaware of his plight, Sweet has "asserted the deliberateness of her indifference as an affirmative defense." *Id.* at 7. He does not claim that she subjectively knew he was even in the Jail, much less that she inferred that he faced a substantial medical risk if he did not obtain and take his medications.

The Jail hired Sweet as an independent contractor three weeks before Bell was incarcerated at the Jail. Dkt. 159-1 at 3–6. She was to be paid $5,000 per month ($60,000

per year) and agreed to be available for telephone consultation "24/7." *Id*. She was not, however, hired as the Jail's HCA, and neither she nor the Tribe agreed that she would be the Jail's inmates' full-time doctor. Sweet maintained full-time practice away from the Jail. *Id*.; *see also* Dkt. 168 at 2 (citing Sweet Decl., Dkt. 170). She testifies that she would work one to two hours per day, two to three days per week, providing medical consultation and prescription re-fills as needed. And there is no evidence at all that Sweet had authority to hire, train, discipline, or fire any other Jail employee, including the CMA. *See* Dkt. 170. She asserts that she was "not responsible for administering the medical program" at the Jail, and that her contract did not authorize or require her to do so. Dkt. 168 at 3. Sweet was hired instead to provide specific medical services "*in support of*" the Jail's "medical operations." Dkt. 159-1 at 3, ¶ 4 (emphasis added).

Bell's primary argument—which, but for the Tribe's sovereign immunity, would be effective against the Jail's administration—is that the Jail was legally and by its own policy required to have an HCA, someone in charge of the Jail's entire medical program. Bell correctly asserts that Jail policy calls for "Medical Intake Screening conducted by a member of the medical staff to identify obvious ailments or injuries and reduce aggravation" and "timely health appraisal of each inmate including a complete medical screening within 24 hours of admission." Dkt. 159 at 7 (citing Dkt. 159-1, Ex. J at 217–22). Bell asserts he did not receive such an appraisal.

From these requirements, Bell deduces that since Sweet was the only licensed physician associated with the Jail, she necessarily must have been its HCA. As such, he claims that she was obligated to conduct such medical screenings and appraisals. He also

argues that Sweet was the supervisor of all those who failed to expeditiously ascertain and meet Bell's medical requirements, from his initial intake until his stroke, 19 days later, and that she is liable for those failings.

Sweet argues again that she timely filled Bell's medications as soon as she learned of his need for them, consistent with her duties under the contract with the Jail. She argues correctly that the failure to follow a policy is not necessarily a constitutional violation. Dkt. 168 at 21 (citing *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997) ("[T]here is no § 1983 liability for violating prison policy. [Plaintiff] must prove that [the official] violated his constitutional right[.]")). And it was the Jail, and not Sweet, which failed to follow Jail policies. Sweet argues that she was not the Jail's HCA as a matter of law and that there is no evidence supporting Bell's claim that she has supervisor liability for the constitutional torts of those she supervised or failed to supervise. Dkt. 168 at 16.

Sweet argues that supervisor liability exists if the "official implements a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind the constitutional violation." *Id.* (quoting *Marcotte v. Monroe Corr. Complex*, 394 F. Supp. 2d 1289, 1297 (W.D. Wash. 2005)). Sweet did not implement any policy at the Jail; the policies existed before she was hired. She also argues that to be liable for the actions or omission of her subordinates, a supervisor must have knowledge of the violations and fail to act to prevent them, and that liability will not attach to defendants who "cannot be supervisors of persons beyond their control." Dkt. 168 at 17 (quoting *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018) (administrators who had no supervisory authority over the police who allegedly committed violations did not

participate in or cause such violations)). Sweet argues she was never designated the Jail's HCA and that there is no evidence she had any duties or authority with respect to any other Jail employee, including the CMA. She was instead an independent contractor hired to provide limited and specific services in support of the Jail's medical program.

These arguments are persuasive. There is no evidence that Sweet made any intentional decision to delay screening Bell or to provide him his prescribed medications once she learned of his need for them. There is no evidence that the consequences of her actions "obviously" put Bell at medical risk; when she examined him on August 25 his blood pressure was high but not critical, and he was already on his medication. *See Gordon*, 888 F.3d at 1125. There is no evidence whatsoever that she was subjectively aware of a substantial risk of harm to Bell and failed to take any action in response to it. *See Farmer*, 511 U.S. at 837.

Bell's Motion for Partial Summary Judgment on Sweet's deliberate indifference to his medical needs, personally and as a supervisor, is DENIED.

**2.      Sweet's Summary Judgment Motion is Granted.**

Sweet's motion presents the opposite side of the same issue. It argues that under the same evidence, she is entitled to judgment as a matter of law on both iterations of Bell's § 1983 deliberate indifference claims against her.

Bell's Response echoes his own motion, discussed above. He emphasizes that, contrary to Jail policy, he was "never examined by any medical practitioner until the day before his stroke, which was the 18th day of his detention." Dkt. 167 at 4. He complains that he "never got his medications until it was too late." *Id.*

1   Bell argues that a prison health care delivery system may reflect deliberate
2   indifference to the plaintiff's medical needs where unqualified personnel regularly
3   engage in medical practice. *Id*. at 5 (citing *Toussaint v. McCarthy*, 801 F.2d 1080, 1112
4   (9th Cir. 1986), *overruled in part on other grounds* (citing *Hoptowit v. Ray*, 682 F.2d
5   1237, 1252) (9th Cir. 1982)). He asserts that Sweet left the medical screening to the
6   guards and the CMA, neither of whom were qualified to provide medical care, and that
7   she did not provide care to inmates "unless and until inmates were brought before her."
8   Dkt. 167 at 6.

9   Bell argues that under *Hoptowit*, a prison is deliberately indifferent where it has no
10  full-time chief medical officer, has no written procedures, leaves medical decision to
11  unqualified and unsupervised mid-level practitioners, fails to have a daily sick call, and
12  leaves the decision of which inmates get medical care to the prison guards. *Id.* (citing
13  *Hoptowit*, 682 F.2d at 1252.

14  But as in *Hoptowit,* these failings are on the *Jail*, not on the part-time physician it
15  hired to do just what she did, and not to do the other functions that are apparently lacking
16  at the Jail. Sweet was not the Jail's HCA as a matter of law, and she was not globally
17  responsible for its medical program. She is not liable for any of these failings, even if
18  they did cause Bell's stroke—a questionable proposition which the Court need not
19  address.

20  Sweet's Motion for Summary Judgment on Bell's deliberate indifference claims
21  against her is GRANTED, and those claims are DISMISSED with prejudice.

22

### C. Bell's negligence claims.

Sweet seeks summary judgment on Bell's negligence claims, which include a medical negligence claim and a negligent infliction of emotional distress ("NIED") claim. She argues that in the medical care context, negligence claims are governed exclusively by RCW Chapter 7.70, Washington's medical malpractice statue. She argues that other negligence claims in the medical context are pre-empted by that statute, which requires a plaintiff to demonstrate:

> (a) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances; and
>
> (b) Such failure was the proximate cause of the injury complained of.

RCW 7.70.040.

Sweet argues, persuasively, that neither of Bell's experts provide evidence of the standard of care or how Sweet breached it. Dkt. 160 at 20 (citing *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 226–227 (1989)). Nor does either expert provide testimony on how Sweet's violation of the standard of care caused Bell's injury.

Bell responds by explaining why his negligence claim was initially broadly pled— the Tribe, asserting sovereign immunity, would not disclose even Bell's own medical records without a Court Order compelling it to do so, and he did not know the names of various individuals at the Jail—but he does not claim that his experts address the standard of care applicable to Sweet. The applicable standard of care in medical malpractice actions must generally be established through expert testimony. *Reyes v. Yakima Health*

1  *Dist.*, 191 Wn.2d 79, 86 (2018). He instead claims without support that failing to provide
2  timely care is well below the standard of care and argues a jury could find that Sweet's
3  "nonfeasance amounted to a breach of the standard of care." Dkt. 167 at 12.
4       Under Washington law, a jury could not so find, in the absence of expert
5  testimony establishing the standard of care. Sweet's Summary Judgment Motion on this
6  point is GRANTED.
7       Finally, Sweet argues that Bell's NIED claim, and his common law negligence
8  claim, are pre-empted or foreclosed by RCW Chapter 7.70. Bell agrees that his NIED
9  claim can be dismissed. He does not address his common law negligence claim separate
10  from his medical malpractice claim, and that claim too is DISMISSED. Sweet's Motion
11  for Summary Judgment on Bell's state law negligence claims is GRANTED, and those
12  claims are DISMISSED with prejudice.
13            \* \* \*
14       The Court is not unsympathetic to Bell's plight, or to his frustration with the care
15  he received. It shares his concern over the City's and the Tribe's efforts to avoid *any*
16  accountability for the conditions at the Jail, including the medical treatment of inmates
17  there. Judge Leighton's prior Orders reflect that he too was troubled by the implications
18  of the arrangement between Lacey and the Tribe. Nevertheless, any institutional failings
19  that caused Bell's stroke were on the part of the Jail, not Dr. Sweet, as a matter of law.
20       The case is DISMISSED. The Clerk shall enter a JUDGMENT and close the case.
21       IT IS SO ORDERED.
22       //

1     Dated this 30th day of September, 2021.

*[signature]*

BENJAMIN H. SETTLE
United States District Judge

ORDER - 17